In re DUNTLEY.

PATTEN et al. v. DUNTLEY.

(Circuit Court of Appeals, Seventh Circuit. October 5, 1915.)

No. 2207.

**1.** Bills and Notes ☞310, 335—Rights of Indorsees—Notice.

T.'s agent agreed with P. that P. could sell notes owned by T. for $15,000, and at P.'s suggestion agreed to leave them with a brokerage house. P. personally took the notes to the brokerage house, which issued two receipts, each covering one-half of the notes, and reciting that they were held in trust, subject to return or accounting for $7,500. *Held* that,

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

whatever rights bona fide purchasers or lien creditors might have acquired, the transaction as between the parties was valid, and did not amount to a sale on credit, but a bailment, with an agreement to sell for cash, and P., who knew all of the facts, could not acquire legal title from the brokerage house, whether in payment of a pre-existing debt or for cash.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 742, 743, 817; Dec. Dig. ☞310, 335.]

2. BILLS AND NOTES ☞310—RIGHTS OF INDORSEES—NOTICE.

That T.'s agent received from the brokerage house sums aggregating $4,500 did not convert the agreement to sell for cash into a sale on credit; the retention of the receipt negativing any possible waiver of the condition precedent to the passing of title, payment in full.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 742, 743; Dec. Dig. ☞310.]

3. ATTORNEY AND CLIENT ☞129—COMPENSATION—SUFFICIENCY OF EVIDENCE.

On a petition to have D. adjudicated a bankrupt, evidence *held* insufficient to show that one of the petitioning creditors, whose claim was for legal services in connection with the execution of notes to take up notes previously executed on which the bankrupt claimed he was not personally liable, was derelict in his duty to his client, so as to defeat his claim for compensation.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 284–291; Dec. Dig. ☞129.]

4. ATTORNEY AND CLIENT ☞123—COMPENSATION—ACCOUNTS STATED.

An attorney sent D., a former client, a bill for services, and later asked him whether it was convenient to pay, and D. answered that the bill was all right, but that L. had charge of his financial affairs and would see the attorney. A few days later L. saw the attorney, and stated that he would be in in a few days and make a partial payment, and pay the rest as well as he could. It appeared that the relation of attorney and client had ceased prior to the conversation between the attorney and D., and that D. had then independent and able legal advisers. *Held*, that the facts showed an account stated.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 239–245, 248, 249; Dec. Dig. ☞123.]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois; Kenesaw M. Landis, Judge.

In the matter of John W. Duntley, bankrupt. From a judgment dismissing the petitions of Frank C. Patten and another to have Duntley adjudicated a bankrupt, the petitioners appeal. Affirmed in part, and reversed and remanded in part.

Louis E. Hart, of Chicago, Ill., for appellee.

Before BAKER, KOHLSAAT, and MACK, Circuit Judges.

MACK, Circuit Judge. This is an appeal from a judgment dismissing the petition of appellant Patten and the intervening petition of appellant Morris to have appellee Duntley adjudicated a bankrupt, on the ground that neither petitioner nor intervener had a provable claim.

Appellee, by his answer to the original petition, denied insolvency, the commission of any acts of bankruptcy, and that Patten had a provable claim; alleged that the title to the promissory note of $500 on

which Patten based his claim was in dispute in a cause pending in the state court wherein, on a bill filed by one Townsend, who claimed title to this and other notes, and the appellee, Patten had been enjoined from selling or transferring the notes; and further charged that the execution of the note had been procured by Patten and others by fraud and duress, and that the consideration therefor had wholly failed.

To the intervening petition he answered, denying the commission of the acts of bankruptcy, insolvency, that Morris was a creditor for $750 for legal services, as alleged, or for any amount.

[1, 2] Patten's note is one of a series given by the bankrupt under the following circumstances: Townsend owned two series of notes, each of which aggregated $35,000; the first executed by Duntley, the second, executed two years thereafter, by the Duntley Manufacturing Company. Both were given for the single loan of $35,000, originally made to Duntley before the company was organized, by a bank of which Townsend was president. Townsend had placed all the notes in the hands of his attorney, Faissler, with power to collect or to sell them. Appellant Patten was employed by Faissler to assist in their collection, and by unauthorized threats of bankruptcy proceedings induced Duntley to pay $500 cash and to execute a new third series of notes to his own order and indorsed in blank, in lieu of the other two series which were overdue. The cash and the new notes represented the $35,000 and accrued interest. In place of shares in the Duntley Manufacturing Company, theretofore given as collateral, certain contract rights belonging to Duntley, as well as a life insurance policy, were transferred by a trust instrument to Morris to secure the new notes. The third series of notes and the cash were delivered to Townsend's agent and attorney, Faissler; the first and second series with the stock collateral were returned to Duntley; Faissler thereupon paid Patten the $500 for his services. Faissler took the notes with him to Sycamore, Ill., where both he and Townsend resided.

Some days later, Faissler agreed with Patten that the latter could sell the notes for $15,000, and, on Patten's statement that he could not use them unless they were in Chicago, agreed to leave them with a brokerage house suggested by Patten, Lyon, Ratcliffe & Co., a corporation in Chicago. He handed them to Patten, who took them to Lyon, Ratcliffe & Co., and brought back to Faissler two receipts, signed by Lyon, Ratcliffe & Co., dated February 2, 1914, and reading as follows:

"Chicago, February 2, 1914.

"Received of John Faissler the following notes, signed by J. W. Duntley, which are held in trust, subject to return or accounting in full with our check for $7,500.00."

"Chicago, February 2, 1914.

"Received of John Faissler the following notes, signed by J. W. Duntley, which are held in trust, subject to a satisfactory accounting of $7,500 for same."

One-half of the notes are specified in each receipt. During the next few weeks, Faissler received in the aggregate $4,500 from Lyon, Ratcliffe & Co. and used the money on behalf of Townsend. At the time that Patten left the notes with Lyon, Ratcliffe & Co. he arranged to

sell them to this corporation for their face value, netting for himself the difference of about $24,000. Neither Faissler nor Townsend knew anything about this deal.

It is apparent from these facts that the legal title to the third series of notes vested at once in Townsend. The receipts demonstrated Lyon, Ratcliffe & Co.'s knowledge that, until the $7,500 was paid to Faissler, neither it nor Patten would acquire title to the notes specified therein. Whatever rights bona fide purchasers from or lien creditors of Lyon, Ratcliffe & Co. might acquire in and to the notes as against Townsend, the transaction evidenced by the receipts was entirely valid as between the immediate parties and as against any one who attempted to secure rights to the notes with knowledge of the facts. It effectuated, not a sale on credit, but a bailment with an agreement to sell for cash and the consequent right to acquire title to the notes specified in each receipt only on the payment of the agreed consideration of $7,500. The mere receipt of payments on account would not change the legal situation and convert an agreement to sell for cash into a present sale on credit. Faissler's retention of the receipt negatived any possible implied waiver of the condition precedent to the passing of title, payment in full. The record is devoid of the slightest evidence that either Faissler or Townsend intended to trust to the personal credit of either Patten or Lyon, Ratcliffe & Co.

Patten knew all the facts hereinabove recited. He could not, therefore, acquire from Lyon, Ratcliffe & Co. the legal title to negotiable paper, whether in payment of a pre-existing debt or even for cash. If this third series of notes constituted a valid obligation, Townsend, and not Patten, was their owner and Duntley's creditor. Irrespective, therefore, of the effect of the prior proceedings in the state court, the original petition was properly dismissed on the ground that Patten had no provable claim.

[3, 4] No evidence was offered that the reasonable value of Morris' legal services was $750, or at least $500, the amount necessary to enable him as sole creditor to maintain the petition, or, indeed, any other sum. He relied entirely upon an account stated. In support thereof, he testified as follows:

"I then subsequently [after January 29, 1914] sent in a bill to him for $750 for services and received no reply to it, and after waiting I think a month I called him up over the phone and asked him whether it was convenient to pay that bill, and he said to me the bill was all right, but Mr. David B. Lyman, Jr., had charge at that time of his financial affairs, and Mr. Lyman, would come in and see me. Mr. Lyman came in a day or two afterwards, and said: 'Speaking about your bill, Mr. Duntley is somewhat hard up now, and if we can pay that in installments it would be satisfactory to him.' I stated to him I was ready to meet Mr. Duntley's necessities any time. He said: 'Well, I will be in in a few days and make a partial payment, and extend the rest along, and pay the rest as well as I can.' From that time forth I have heard nothing in regard to my bill and have received no payment on it. I never have had any word from Mr. Duntley. He never said to me it was incorrect, nor did he ever criticize me for my position in the matter personally."

On cross-examination, he testified:

"Q. Mr. Morris, you say that Mr. Duntley never criticized you in any way with reference to your representation of him? A. Not personally to me.

Q. Well, he did file a bill against you, and obtain a preliminary injunction in March, 1914, didn't he, in which bill he charged that you had been conspiring with Patten to defraud him? A. In conjunction with Mr. Townsend, yes. Q. You did not consider that a criticism? A. I said, 'Not personally to me.' Q. You mean, when you say 'Not personally to me,' he never came to you face to face and told you he thought you tried to do him? A. I consider that he is a mere interpleader. Q. You consider that he is a mere interpleader? A. Yes."

The defense attempted to be made under the denial that Morris had a provable claim is based on Morris' alleged dereliction of duty to his client. Morris had been attorney for Patten in various matters. A few weeks before the third series of notes was executed, Patten and Duntley were negotiating in reference to financing another corporation in which Duntley was interested. Morris, at that time, drew up an agreement on behalf of Patten, but the deal fell through. In this way he became acquainted with Duntley and learned of his condition. The attorney who had theretofore managed Duntley's affairs, at least those involved in the first and second series of notes, was critically ill and soon thereafter died. When Duntley was being pressed by Patten for payment of the notes, and was being threatened with bankruptcy proceedings, he retained Morris to act for him. Morris had refused to act for Patten in instituting bankruptcy proceedings, and consented to act as Duntley's attorney only after Patten waived any objections thereto. Morris did not see the first and second series of notes before drawing up the third series and the trust agreement, but acted on Duntley's statements. Duntley now claims that the second series of notes was given in substitution and payment for the first series, and that when they were given he expected to get back the first series; that under these circumstances he individually had a valid defense to the first series of notes, and but for the alleged wrongful act of Morris in not properly guarding his interests and investigating the matter, and in falsely stating, according to Duntley's testimony, that Duntley was an indorser on the second series, Duntley would not have executed the third series, and thereby have involved himself in further personal liabilities.

Morris denied having stated to Duntley that he was an indorser on the second series of notes. If the question were to be determined solely on this conflict, a finding by the trial judge, who had the opportunity of seeing the witnesses, would be conclusive as to Morris' dereliction of duty, and the finding that, "In view of the manner in which said claim of said Joseph O. Morris arose, this court declines to find that said claim of Joseph O. Morris is a provable claim in bankruptcy against the said John W. Duntley," might be interpreted as finding such dereliction of duty.

Duntley's statements, however, are directly contradicted by the bill of complaint, filed by him and Townsend in the state court, sworn to by both of them and introduced in evidence at the hearing. No claim is made therein that the second series was given in payment of the first. On the contrary, it is there charged that both series are now owned by Townsend, and that Duntley is ready to redeliver both of them to Townsend on the cancellation of the third series, which they

charge had been obtained under unauthorized threats to begin bankruptcy proceedings and with the purpose of misappropriating them and thus defrauding Townsend. Townsend and Faissler were both witnesses. Townsend had been president of the bank that made the original loan of $35,000. He had purchased $20,000 of the notes before the second series was issued, and subsequently purchased the other $15,000; $20,000 of the second series were made payable to Townsend's order and delivered to him; the others were made payable to the bank and delivered to it. Faissler was connected with the bank. Neither of them testified in corroboration of Duntley's statement that he expected the first series to be given up when the second series was executed.

On his direct examination, Duntley testified that he joined Townsend in bringing the suit in the state court when he discovered the falsity of Morris' statement that he was an indorser on the second series of notes. If the discovery of the falsity of the alleged statement not merely preceded, but, as Duntley's testimony was evidently intended to imply, caused him to begin the suit, and if his testimony in this cause as to the relation between the first and second series of notes were true, it is more than passing strange that in the bill of complaint he should have admitted the validity of the first series and his personal liability thereon as maker. This bill was filed on March 17, 1914, less than two months after the third series of notes was executed, and necessarily within a short time after Lyman's statement to Morris. In view of the allegations in this bill of complaint, and of Duntley's consequent liability as maker of the first series of notes, a statement that he was indorser of the second series, although erroneous, would have been entirely unimportant. We are satisfied, however, for the reasons above stated, that the conflict on this point must be determined in favor of Morris.

Whatever wrong may have been intended and committed against Townsend in connection with the third series of notes, Duntley could only benefit by their exchange for the first and second series. He thereby secured a long extension on a completely matured debt. We find nothing in the evidence to sustain a defense to the Morris claim based on a dereliction of his duty to his client. Morris was retained solely in connection with the refunding of these notes. At that time, and at the time Duntley acknowledged that the bill of $750 was all right, and stated that he would have Lyman see Morris about it, the relation of Duntley to Morris as client to attorney had ceased. Duntley, at that time, had independent and able legal advisers. Under these circumstances, the account stated must be held to have been fully proved.

The judgment, in so far as it dismisses the original petition, is affirmed; in so far as it dismisses the intervening petition, it is reversed, and the cause is remanded for a new trial on the other issues made by the intervening petition and the answer thereto.